# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| PABLO A. DAMIANI, | : | |
|---|---|---|
| Plaintiff, | : | |
| v. | : | Civ. No. 12-1637-RGA |
| DETECTIVE DUFFY, et al., | : | |
| Defendants. | : | |

Pablo A. Damiani, James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

Michael F. McTaggart, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants Detective Sean Duffy, Gary Potts, Daniel Grassi, Corporal Lano, Eric Daniels, John Dudzinski, Mark Hawk, Ronald Kline, Corey Godek, Detective Jack Tsai, Detective Thomas Rhoades, Detective John Glenn, Rob Kracyla, James Kelly, Scott Galbreath, and Alfred Parton.

David C. Weiss, Acting United States Attorney, and Jennifer Lynne Hall, Assistant United States Attorney, Wilmington, Delaware. Counsel for Defendant Casey Bouldin.

Rosamaria Tassone-DiNardo, Esquire, City of Wilmington Law Department, Wilmington, Delaware. Counsel for Defendant Detective Stephen Morrissey.

## MEMORANDUM OPINION

October ₦ , 2017
Wilmington, Delaware

**ANDREWS, U.S. District Judge:**

Plaintiff Pablo A. Damiani, an inmate at the James T. Vaughn Correctional Center, Smyrna, Delaware, filed this action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 389 (1971).[1] He also raises supplemental State law claims. He appears *pro se* and has been granted leave to proceed *in forma pauperis.* (D.I. 7). Plaintiff raises excessive force and failure to protect claims against Defendants. Before the Court are Defendants' Motions for Summary Judgment. (D.I. 261, 264, 269).[2] Briefing on the motions is complete.

## LEGAL AND FACTUAL BACKGROUND

Plaintiff commenced this action on December 4, 2012, alleging violations of his constitutional rights under 42 U.S.C. § 1983. (D.I. 2). The Court dismissed the original complaint, Plaintiff amended numerous times, and the matter proceeds on the Fourth Amended Complaint ("Amended Complaint"). (D.I. 214). Named defendants include New Castle County Police Department Detective Casey Bouldin, who was acting as a task force officer with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives; Wilmington Police Department Detective Morrissey, who was also assigned to the ATF task force; and State of Delaware employees Detective Duffy, Detective

---

[1]When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988). Where a litigant sues federal actors for damages on constitutional grounds, the claim is governed by *Bivens,* 403 U.S. at 389.

[2]The parties have submitted numerous exhibits, many of them duplicative. For example, all Defendants have submitted the transcript of Plaintiff's deposition. When referring to facts for which there are duplicative exhibits, for the sake of simplicity, the court will cite to only one exhibit rather than to each exhibit provided by the parties.

Gary Potts, Detective Daniel Grassi, Corporal Lano, Corporal Eric Daniels, Corporal John Dudzinski, Sergeant Mark Hawk, Detective Ronald Kline, Detective Corey Godek, Detective Rhoades, Detective Glenn, Rob Krisilla (*i.e.*, Kracyla),[3] James Kelly, Scott Galbreath, and Alfred Parton (collectively "State Defendants"). Plaintiff alleges Defendants used excessive force during his apprehension and arrest on December 6, 2010, and failed to intervene to stop the alleged excessive use of force, all in violation of his Fourth Amendment rights. Following his arrest, Plaintiff was charged, tried by a jury in September 2011 in the Superior Court of the State of Delaware in and for New Castle County, and convicted of eighteen counts of robbery in the first degree, thirty-three counts of possession of a firearm during the commission of a felony, eleven counts of wearing a disguise, six counts of conspiracy in the second degree, six counts of aggravated menacing, eight counts of attempted robbery in the first degree, and one count of reckless endangering in the first degree. *Damiani-Melendez v. State*, 55 A.3d 357, 358-59 (Del. 2012). He received a total sentence of 297 years, followed by a period of Level II probation. (D.I. 271 at A26).

The arrest and conviction occurred after the Delaware State Police's Fall 2010 investigation of a string of armed robberies of retail and liquor stores in New Castle County. (D.I. 263 at Ex. 2 at DSP499-500). The robberies all appeared to be related, and all involved the use of weapons. (*Id.* at DSP499-500, 508). Due to the frequency of the robberies, members of the State Police and other law enforcement agencies met on December 6, 2010 for a briefing on a large-scale effort to catch the perpetrators. (*Id.*

---

[3]The correct spelling is Kracyla.

2

at DSP500-01). The law enforcement agencies decided that each night, teams of two officers would be assigned to as many area liquor stores as possible, and the officers would wait until the perpetrators arrived. (*Id.*). The officers were told that the perpetrators were armed and that the getaway car was a dark-colored Honda Civic. (*Id.* at DSP527).

As officers left the briefing, a call came in at 7:33 p.m. stating that American Liquors on Old Baltimore Pike had been robbed. (*Id.* at DSP501). A second call came in at 8:13 p.m. stating that Tobacco Plus in the Four Seasons Shopping Center had been robbed. (*Id.*). At 8:52 p.m., a third call came in stating that Airport News and Tobacco in Wilmington Manor had been robbed. (*Id.*).

ATF task force officers Bouldin and Morrissey were assigned to Silview Liquors on West Newport Pike. (D.I. 263 at Ex. 2 at DSP502, 527; D.I. 271 at A1-A4, A9-A10). After the call about the third robbery, Bouldin saw an individual wearing a black hooded sweatshirt walk into Silview Liquors. (D.I. 263 at Ex. 2 at DSP527-28). A few minutes later, the person in the black hooded sweatshirt left the store, started to run, and stepped into a dark-colored Honda Civic. (*Id.*). Morrissey also saw the individual, who was later identified as Plaintiff, enter and leave the liquor store, move quickly to his vehicle, and drive away. (D.I. 271at A3-4, A10-13).

Bouldin, who was driving his undercover vehicle, a Dodge Ram pickup, pulled in behind Plaintiff and began following him. (D.I. 263 at Ex. 2 at DSP527-28). Bouldin called out the Civic's tag number and was advised by radio dispatch that Silview Liquors had just been robbed. (*Id.*). Morrissey, who was driving his undercover vehicle, a white Ford F-150 truck, saw the Civic drive away, followed by Bouldin. (D.I. 271 at A1). As

3

Morrissey pulled out, he heard the radio dispatcher advise that Silview Liquors had just been robbed at gunpoint. (D.I. 263 at Ex. 2 at DSP527-28; Ex. 3 at DSP1031-32; D.I. 271 at A2.)

Morrissey lost sight of Plaintiff's car during the pursuit. (D.I. 271 at A2). By this time, several police officers had joined the pursuit. (*Id.*). Plaintiff led a caravan of unmarked police vehicles on a high-speed chase. (D.I. 263 at Ex. 1 at 22; Ex. 2 at DSP528-29; Ex. 3). Plaintiff stated that he was speeding, traveling in excess of 70 miles per hour, and trying to lose the cars. (D.I. 263 at Ex. 1 at 71, 185). Plaintiff lost control of the vehicle after he attempted to execute a U-turn by engaging the emergency brake. (*Id.* at 72-73). Plaintiff was stopped near the entrance of Delaware Park at approximately 9:00 p.m. (D.I. 263 at Ex. 1 at 27; Ex. 2 at DSP528-29).

Once Plaintiff's car stopped, undercover police vehicles blocked the front, rear, and driver's side of the vehicle. (D.I. 266 at A19). Daniels' vehicle was next to the driver's side door of Plaintiff's car. (*Id.* at A1). Galbreath's unmarked SUV also blocked Plaintiff's car. (*Id.* at A5).

According to Potts, all officers were wearing identifying clothing, and the police cars had police lights. (D.I. 266 at A-19). According to Plaintiff, however, there were no flashing lights, and the police were wearing regular clothes. (D.I. 263 at Ex. 1 at 28; Ex. 12 at 15). He could not recall if the officers were wearing police vests. (D.I. 263 at Ex. 1 at 31). According to Plaintiff, within two seconds, officers stepped out of their cars and yelled for him to put his hands up. (*Id.* at 22-23, 28-29). Also according to Plaintiff, in the next fifteen or twenty seconds, officers ordered him to put his hands out of the window, and an officer cuffed him. (D.I. 263 at Ex. 1 at 23-24, 29-30).

4

Kelly, a probation officer, pointed his gun at Plaintiff's car. (D.I. 266 at A5). Kelly says that he never left his car and was told by other officers to duck to avoid any potential cross fire. (*Id.* at A12). He did not see any of the arrest and left the scene after he was told that the situation was "all clear." (*Id.*). Parton drew down on Plaintiff's vehicle with a rifle and remained there until other officers were able to place Plaintiff in handcuffs. (D.I.184-2 at 20; D.I. 266 at A26). According to Parton, Plaintiff did not give up his hands and resisted arrest. (D.I. 266 at A26). Parton had no contact with Plaintiff. (*Id.*)

Plaintiff's driver's side window was partially down. (D.I. 266 at A19). According to Potts, Galbreath, and Parton, the officers present gave Plaintiff numerous commands to turn off his vehicle and show his hands, but Plaintiff did not acknowledge or respond to the commands. (D.I. 266 at A6, A19, A26). According to Plaintiff, he put his hands up and, after a little bit, when he saw the guns, put his hands out the window. (D.I. 263 at Ex. 1 at 23-24; Ex. 12 at 17).

Plaintiff's car doors were locked, and the car's windows were tinted dark so Daniels and Galbreath could not see how many individuals were inside. (D.I. 263 at Ex. 1 at 32-33; Ex. 2 at DSP529; D.I. 266 at A1, A6). Daniels was aware that the robbery suspects were armed. (D.I. 266 at A1). Galbreath attempted to open the passenger door, but it was locked, so he returned to his car to retrieve a Hooligan tool, which is a heavy-duty, forcible-entry tool. (*Id.* at A6). Daniels went to the passenger side of Plaintiff's car and used his gun to partially break the window. (D.I. 263 at Ex. 1 at 24, 32-34; D.I. 266 at A1).

5

When Plaintiff put his hands out the driver's side window, Bouldin handcuffed Plaintiff in front, through the open window with the door closed. (D.I. 184-3 at 5; D.I. 263 at Ex. 1 at 23-24; Ex. 2 at DSP529-30; D.I. 266 at A19). Bouldin held on to the cuffs while another officer moved a police car that was blocking Plaintiff's driver's side door. (D.I. 263 at Ex. 1 at 24-25; Ex. 2 at DSP529-30). Dudzinski arrived around this time. (D.I. 266 at A395). According to Potts and Daniels, Plaintiff refused commands to get out of the car, continued to move around in the driver's seat, lowered his hands so that there were out of sight below the dashboard, and had to be physically removed from his vehicle. (Id. at A2, A19). Daniels came around to the driver's side and pointed his gun at Plaintiff. (Id. at A2).

Bouldin continued to hold onto the handcuffs as two or three officers approached. (D.I. 184-3 at 5). Either Daniels or another officer opened Plaintiff's car door to remove Plaintiff from the vehicle. (D.I. 266 at A2). Dudzinski recalls assisting in this process. (Id. at A395). According to Plaintiff, an officer, unidentified by Plaintiff, said to Plaintiff, "When I open this door, you are to fall face first on the ground," and Plaintiff replied, "No problem." (D.I. 263 at Ex. 12 at DSP966). As one of the officers opened the door, Bouldin continued to hold onto the handcuffs, and two of the officers tried to grab Plaintiff from the vehicle. (D.I. 184-3 at 5). Bouldin released the handcuffs and moved to the passenger side of the vehicle to help clear the rest of the vehicle. (D.I. 184-3 at 5; D.I. 263 at Ex. 14 at 9). At this point, Bouldin heard, "my foot is stuck" or "his foot is stuck." (D.I. 263 at Ex. 14 at 9-10). Plaintiff testified that the officers initially could not remove him from the car because his right sneaker was caught on the seat adjustment lever, and this made it difficult for the officers to pull him out. (D.I. 263

6

at Ex. 1 at 25, 49, 202-03). Plaintiff stated that he cut his heel on the lever as he was pulled out because the lever was sharp and missing its plastic cover. (*Id.* at 49).

The officers pulled Plaintiff out of his car and onto the asphalt in seconds. (D.I. 263 at Ex. 1 at 25, 36, 40, 202-03; Ex. 13 at DSP1153). Daniels grabbed onto Plaintiff, and Plaintiff fell "hard" face first onto the asphalt. (D.I. 184-2 at 25; D.I. 266 at A2). According to Daniels, it was "real hard" because the officers did not know the proximity of the weapon or anything at that point in time. (D.I. 184-2 at 25). Once Plaintiff was on the ground, Daniels was on the ground near Plaintiff's left arm, in a "catcher's mitt position" to make sure that there was not extra weight on Plaintiff. (D.I. 184-2 at 25; D.I. 266 at A2). Potts states, at this point, Plaintiff had not yet been patted down and thus posed a threat to the officers' safety. (D.I. 184-2 at 12). Dudzinski states that at this point, he had no idea if Plaintiff was armed and that he would not know until Plaintiff was frisked, which occurred some time after his removal from the car. (D.I. 266 at A396). Plaintiff testified that, after he was taken to the ground, "three, maybe four" officers kicked and hit him with a "metal thing" in the head, face, chest, stomach, and legs, and called him names. (D.I. 263 at Ex. 1 at 25-26, 51-52). He could not remember how long the kicking continued, but it was "not even" a minute. (*Id.* at 57-58).

Once Plaintiff had been removed from the vehicle and the passenger side had been cleared, Bouldin returned to his vehicle. (D.I. 263 at Ex. 2 at DSP530; Ex. 14 at 10). Bouldin states that he did not see anyone use excessive force on Plaintiff. (D.I. 263 at Ex. 14 at 4-6, 9-10).

7

After Plaintiff had been taken into custody, Galbreath returned with the Hooligan tool and used it break out the passenger window. (D.I. 266 at A6). According to Galbreath, he never went near Plaintiff once he was removed from the vehicle. (Id.). Once Plaintiff was on the ground, Galbreath returned to his vehicle. (D.I. 184-2 at 21).

The officers told Plaintiff to get up. (D.I. 263 at Ex. 12 at DSP973-74). According to Plaintiff, a heavyset officer with a mustache standing four feet away from Plaintiff wound up and spat at Plaintiff, and it landed in his hair.[4] (D.I. 263 at Ex. 1 at 52-53, 234-38). Plaintiff testified that he was brought to the side of the road by officers whom he could not identify. (Id. at 26, 60).

Officers moved Plaintiff to a grassy area where the ground was frozen; according to Daniels and Potts, Plaintiff was non-compliant and moving and struggling with the officers during this time. (D.I. 266 at A2, A20). There were officers on top of Plaintiff trying to hold him down while he resisted. (Id. at A20). Potts held Plaintiff down in the leg area. (D.I. 184-2 at 12). Once Plaintiff became compliant, officers patted him down and told him that he would be secured by handcuffs in the back.[5] (D.I. 184-2 at 13). According to Potts, when he removed a handcuff, Plaintiff began to move wildly about

---

[4]While such behavior would be unprofessional and disgusting, it would not violate Plaintiff's constitutional rights. See, e.g., Gill v. Tuttle, 93 F. App'x 301, 303 (2d Cir. 2004) (prison guard spitting on prisoner was de minimis use of force); Williams v. Gobles, 211 F.3d 1271 (6th Cir. 2000) (claim by prisoner that corrections officer spit at him, threatened him, and called him a vile name several times failed to state a claim upon which relief could be granted); DeMallory v. Cullin, 855 F.2d 442, 444 (7th Cir. 1988) (correctional officer's spitting upon prisoner does not rise to the level of constitutional violation).

[5]Changing Plaintiff's handcuffs from the front to the back was done to comply with standard operating procedures. (D.I. 266 at A20).

8

and attempt to break from the officers. (D.I. 184-2 at 13; D.I. 266 at A20). Further, according to Potts, it took three to five officers (including Potts) to secure the handcuffs and cuff Plaintiff a second time. (D.I. 266 at A20). Potts states that during this time, when Plaintiff did not respond to verbal commands, Potts used his body weight and leverage to try to get Plaintiff's unsecured arm behind his back and into the handcuffs. (D.I. 266 at A20). Once Plaintiff was handcuffed behind his back, he stopped resisting and was compliant, says Potts. (D.I. 184-2 at 13).

Plaintiff, on the other hand, told Internal Affairs that he was not fighting at any time or making any motions that could have been perceived as fighting. (D.I. 263 at Ex. 12 at 36). Plaintiff testified that he was placed on the ground, and unknown officers he could not see took turns kicking him and hitting him with a metal object. (*Id.* at 34-35). Plaintiff told Internal Affairs that he was face down with his hands behind his back, telling the officers he could not breathe. (D.I. 263 at Ex. 12 at 34). Plaintiff said he was then hit with a metal object, which was the last thing that hit him. (*Id.* at 35). Plaintiff testified that one officer hit him on his left elbow with a "metal thing," and this caused him to suffer "some nerve damage or some type of damage." (D.I. 263 at Ex. 1 at 26). Plaintiff did not know how long he was kicked. (*Id.* at 63). He testified that he lost consciousness, but medical records indicate that he denied losing consciousness. (*Id.* at 50; Ex. 5 at DSP908). Plaintiff sat down on a curb before he was moved to a State Police cruiser and transferred to Troop 2. (D.I. 184-2 at 13; D.I. 263 at Ex. 1 at 27).

The officers on the scene deny witnessing or participating in a beating. (D.I. 263 at Ex. 13 at DSP1153, 1157, 1163, 1171; Ex. 14 at 4-6, 9-10). Daniels, Potts, Galbreath, and Dudzinski state that they did not strike, punch, or spit on Plaintiff and did

9

not see any officer do so. (D.I. 266 at A2, A6, A20, A396). Daniels, Potts, and Dudzinski state that they did not see any other officer use a baton or other object to strike Plaintiff. (*Id.* at A2, A20, A396). Galbreath states that he did not use the Hooligan tool to strike Plaintiff in any way. (*Id.* at A6). Parton states that he did not witness anyone punching, kicking, or spitting on Plaintiff. (*Id.* at A26).

When Kracyla arrived, Plaintiff was already in custody and was on the ground. (D.I. 184-3 at 9; D.I. 266 at A15). He did not see any force applied to Plaintiff. (D.I. 184-3 at 9). When Morrissey arrived, Plaintiff was already handcuffed and in custody. (D.I. 271 at A2). He says that he did not strike, hit, punch, kick, or spit on Plaintiff and did not see any other officer strike, hit, punch, kick, or spit on Plaintiff. (*Id.*). When Rhoades arrived at the scene, he was told that Plaintiff was already in custody. (*Id.* at A22). Rhoades was not present for Plaintiff's apprehension or arrest. (*Id.*).

Lano arrived after the incident to gather evidence. (D.I. 266 at A17). When Hawk arrived at the scene, Plaintiff had been taken into custody, and he directed Glenn, who was not present for Plaintiff's arrest, to transport Plaintiff to State Police Troop 2. (*Id.* at A7, A10). According to Hawk, he had no physical contact with Plaintiff and did not personally witness Plaintiff's arrest. (D.I. 184-3 at 8; D.I. 266 at A10). Duffy, Kline, and Godek were conducting surveillance elsewhere, and were not present at Plaintiff's arrest on December 6, 2010. (D.I. 266 at A3, A13, A24). Tsai was not involved in the incident or its investigation. (*Id.* at A23).

Grassi, the chief detective on the case, did not arrive at the scene until approximately fifteen minutes after Plaintiff had been taken into custody. (D.I. 266 at A9). When Grassi arrived, Plaintiff was handcuffed and either lying on the ground or

10

sitting with his head down. (D.I. 184-2 at 28-29). Grassi obtained a search warrant for Plaintiff's vehicle and recovered cartons of cigarettes, cash proceeds from the robberies, a backpack used in the robberies, and a loaded .380 Cobra handgun with a bullet in the chamber, which Plaintiff later admitted he had used in the Silview Liquors robbery. (D.I. 263 at Ex. 7 at DSP796-98; D.I. 266 at A9, A20).

Plaintiff testified that the officers who handcuffed and removed him from the car were involved, but he has not identified any individuals.[6] (D.I. 263 at Ex. 1 at 30, 36-38). He testified that he sued defendants because their names appeared on paperwork or reports as being part of the investigation. (Id. at 152, 159). Plaintiff gave a recorded interview to Internal Affairs, which was investigating his excessive force complaint. (D.I. 263 at Ex. 12). At that time, he stated that he could not identify the officers who participated in the alleged excessive force: "Honestly, I can't describe any of those guys who were there because I was just, to be honest with you, I don't remember who was there, who was not there. I'm going, you know, off the report." (D.I. 263 at Ex. 12 at DSP965).

Plaintiff cannot provide any description of the individuals other than skin color (white). (D.I. 263 at Ex. 1 at 30, 38-40). He cannot provide hair color, weight, facial description, or clothing or uniform details. (Id.). Plaintiff testified that he could not identify Bouldin as being present, and he did not know where Bouldin was. (D.I. 263 at

---

[6]Plaintiff has described the incident as, "as soon as I hit the floor, they started punching me and kicking me. Well, I don't know about punching, but I felt, you know, like I might have been punched," he was not hit with the "metal thing" until after being taken to the side of the road; he was kicked and called names after being taken the ground; he could actually see officers both kicking and hitting him; and he was also hit with a "metal thing" and spat upon. (D.I. 263 at Ex. 1 at 25-26, 41-42, 51-52).

Ex. 1 at 59-63). During his deposition, Plaintiff testified that he could not identify any of
the officers he claims inflicted the second beating. (*Id.* at 61-63).

After his arrest, Plaintiff was taken to State Police barracks and photographed.
(D.I. 263 at Ex. 1 at 212-213; Ex. 4). The photographs show face abrasions. (D.I. 263
at Ex. 4). Plaintiff was then taken to the Newark Emergency Center. Medical records
indicate that Plaintiff sustained three face abrasions on his face and one on his scalp.
(D.I. 263 at Ex. 1 at 222-223; Ex. 5 at DSP908-10). Plaintiff complained of right foot,
right heel, and left knee pain, and made no complaints about either elbow. (D.I. 263 at
Ex. 5 at DSP907-10). An x-ray of the right foot revealed no fractures, and there was no
knee swelling. (*Id.*). Plaintiff was discharged with instructions to take over-the-counter
medication. (D.I. 263 at Ex. 5 at DSP906, 910). Plaintiff testified that he sustained face
and scalp abrasions, a cut on the back of his foot from his seat lever, and an inflamed
elbow. (D.I. 263 at Ex. 1 at 49-50).

Plaintiff spoke to his fiancé by telephone two days after his arrest and did not
complain that the officers used excessive force. (D.I. 263 at Ex. 6 at DSP1095 -98).[7]
At the time, Plaintiff did not know that prison calls were recorded. (D.I. 263 at Ex. 1 at
136). Four days after his arrest, Plaintiff was interviewed by detectives investigating the
robberies. (D.I. 263 at Ex. 7). Plaintiff admitted that on the night of his arrest he had
robbed Airport News and Tobacco and Silview Liquors at gunpoint and that the
handgun recovered from his Civic was the gun used during the robberies. (D.I. 263 at

---

[7]Plaintiff told his fiancé that he had robbed four stores the night of his arrest, led
officers on a chase, explained how he pulled his emergency brake in an attempt at a
U-turn getaway, and was stopped near Delaware Park with the gun still in his car. (*Id.*).

Ex. 7 at DSP796-98). Plaintiff made no mention of excessive force during the interview. (*Id*.).

In response to Defendants' motions for summary judgment, Plaintiff submitted an declaration on June 5, 2017 that contradicts his prior statements and deposition testimony that he could not identify or provide adequate descriptions of any individual who allegedly kicked and/or beat him. In the affidavit, Plaintiff now identifies various defendants as committing specific acts. (*See* D.I. 291 at ¶¶ 14, 18).

The Court does not consider the declaration as it contradicts Plaintiff's prior deposition testimony. The declaration now identifies specific defendants as committing specific acts. The Court concludes that the declaration falls within the Third Circuit's definition of a "sham affidavit." That is, the declaration contains contradictory statements which "indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for purposes of defeating summary judgment." *Jimenez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). Courts cannot accord sham affidavits evidentiary weight. *Id*. Hence, I will disregard Plaintiff's declaration in my Rule 56 determination.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "could affect the outcome" of the proceeding. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 n.10 (1986). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must set forth 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citing Fed. R. Civ. P. 56(c)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment. *Id.* at 252. Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Bouldin moves for summary judgment on the grounds that: (1) his actions were objectively reasonable; (2) Plaintiff's inconsistent and contradictory allegations regarding the alleged beating do not create a genuine issue of fact; (3) Plaintiff cannot identify Bouldin as having personal involvement in any misconduct; and (4) Bouldin is protected by qualified immunity. (D.I. 262). State Defendants move for summary judgment on the grounds that: (1) there is no factual basis to support Plaintiff's claims of excessive force; (2) State Defendants are protected by qualified immunity; (3) the Court should decline to exercise supplemental jurisdiction over the State assault and battery claims; and (4) the claims against Galbreath, Kelly, and Parton are time-barred. (D.I. 265). Morrissey moves for summary judgment on the grounds that Plaintiff cannot

14

establish that he violated Plaintiff's constitutional rights and, thus, he is protected by qualified immunity. (D.I. 27).

## DISCUSSION

### Expert Report

State Defendants obtained the expert report of Charles J. Key, Sr., a retired Maryland Police Commanding Officer, on the issue of use of force. (D.I. 266 at A346). I will not consider the expert report for two reasons.

First, Federal Rule of Civil Procedure 56(c)(1)(A) provides that a party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record, including . . . affidavits or declarations." Here, no declaration or sworn affidavit was provided with the expert report. Our appellate court has found that unsworn testimony "is not competent to be considered on a motion for summary judgment." *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970)); *see also Jackson v. Egyptian Navigation Co.*, 222 F. Supp. 2d 700, 709 (E.D. Pa. 2002) (finding that an unsworn expert report cannot be considered as evidence on a motion for summary judgment). In addition, district courts in our circuit have held that an unsworn declaration cannot be relied upon to defeat a motion for summary judgment. *See, e.g., Burrell v. Minnesota Mining Mfg. Co.*, 2011 WL 5458324 (E.D. Pa. June 9, 2011) (refusing to consider expert reports when no timely sworn affidavits were provided with reports and reports were not sworn to under penalty of perjury).

Second, the expert report provides conclusions of law. Although Rule 704 allows experts to provide an opinion about the "ultimate issue" in a case, it prohibits experts

15

from opining about the ultimate legal conclusion or about the law or legal standards. *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) (citing *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006)).

The expert report provides two opposing conclusions on the objective reasonableness of Defendants' use of force in arresting Plaintiff, which consider the accounts of Defendants and Plaintiff, respectively. (*See* D.I. 266 at A346-94). In a § 1983 suit, "'reasonableness' is practically interchangeable with 'excessiveness.'" *Patrick*, 536 F. App'x at 258. Moreover, "[r]easonableness under the Fourth Amendment . . . is a legal conclusion." *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003). Thus, I will not consider the expert report, which contains opinions that speak to the objective reasonableness of Defendants' actions. *See Patrick*, 536 F. App'x at 258 (holding that district court did not abuse its discretion in excluding those parts of expert's testimony which opined on the reasonableness of deputy's actions).

## Personal Involvement

Initially, I note that there is no evidence of record that Kelly, Rhoades, Lano, Glenn, Grassi, Duffy, Kline, Godek, and Tsai had any personal involvement during the events complained of by Plaintiff. As is well established, a defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981)). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual

16

knowledge and acquiescence, however, must be made with appropriate particularity.
*Id.*

Even when construing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that the foregoing Defendants were personally in the events as alleged by Plaintiff. The foregoing Defendants were either not present, arrived after the events in question, had no contact with Plaintiff, or did not witness the events in question. Notably, there is nothing in the record indicating that the foregoing Defendants had any physical interaction with Plaintiff. Absent evidence indicating that they did, no jury could grant a verdict in Plaintiff's favor.

Accordingly, because they had no personal involvement, I will grant the motion for summary judgment filed on behalf of Kelly, Rhoades, Lano, Glenn, Grassi, Duffy, Kline, Godek, and Tsai.

## Excessive Force

The remaining Defendants (Potts, Daniels, Dudzinski, Hawk, Galbreath, Parton, Bouldin, and Morrissey) move for summary judgment on the grounds that the actions they took were reasonable under the circumstances, there were no violations of Plaintiff's constitutional rights, and they are protected by qualified immunity. "[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *Kopec v. Tate*,

17

361 F.3d 772, 777 (3d Cir. 2004); Mosley v. Wilson, 102 F.3d 85, 95 (3d Cir. 1996). A court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. The reasonableness of the officer's use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

Plaintiff alleges the use of excessive physical force. Because the determination of whether the use of force is reasonable is a fact specific inquiry, courts have reached different results depending upon the facts and circumstances of each case. See Pridgen v. Law, 299 F. App'x 211 (3d Cir. 2008) (finding evidence insufficient to show that arresting officers used unreasonable or excessive force in arresting suspect; although suspect sustained bloody nose during the arrest, evidence showed that suspect resisted arrest, tried to flee, and during the struggle, officers and suspect fell on an overturned couch, causing suspect to hit his head on the floor); Bender v. Township of Monroe, 289 F. App'x 526 (3d Cir. 2008) (finding genuine issues of material fact precluded summary judgment on whether police officers retaliated and used excessive force against an arrestee by beating him while handcuffed, hitting him in the face with a flashlight, and breaking his cheekbone, because arrestee had kicked an officer); Davis v. Bishop, 245 F. App'x 132 (3d Cir. 2007) (finding no excessive force by police officers in handcuffing and subduing arrestee who was intoxicated, disobeyed officer's orders to attempt to perform a field sobriety test and get off the hood of the police car, and

18

eventually kicked out the rear window of the police cruiser; although officer admitted to having flung arrestee off the car, officers were confronted with an uncertain situation with an individual who was uncooperative); *Feldman v. Community Coll. of Allegheny*, 85 F. App'x 821 (3d Cir. 2004) (finding no excessive force by police officers when arresting college student, even if, as student alleged, officers wrestled student to the ground and kicked him in the head, when the student resisted arrest and actively struggled with officers when they attempted to remove him); *Nolin v. Isbell*, 207 F.3d 1253, 1255, 1257 (11th Cir. 2000) (finding no excessive force where officer grabbed plaintiff from behind, threw him against a van three or four feet away, kneed him in the back, pushed his head into the side of the van, and searched his groin in an uncomfortable manner).

The reasonableness of defendants' conduct in their use of force is measured by "careful attention to the facts and circumstances" of this case. *See Graham*, 490 U.S. at 396. The undisputed evidence of record is that as a result of a series of armed robberies in the New Castle County area, law enforcement agencies embarked on a large-scale effort to catch the individuals involved in the robberies. Some of the robberies were committed by armed individuals, and the getaway car was a dark-colored Honda Civic. On the night in question, three establishments were robbed prior to the Silview Liquors robbery. While surveillance at Silview Liquors was taking place, it was robbed, and officers were notified by the radio dispatcher that it was an armed robbery. A person wearing a black hooded sweatshirt entered, left the store in a very short time, and moved quickly to his Civic, a vehicle that matched the description provided by law enforcement.

Plaintiff was driving the car, and a high speed chase ensued. Plaintiff took evasive, albeit unsuccessful, measures to avoid those chasing him. Although Plaintiff stated that he did not know if the individuals giving him chase were police officers, he testified that once he stopped, he was ordered to put his hands up, an order typically given by the police. Plaintiff testified that he put up his hands "after a little bit." In other words, he did not put up his hands right away. Also, Plaintiff's vehicle had tinted glass that did not allow police officers to see if anyone, other than Plaintiff, was in the vehicle, nor did it allow officers to see if there was a weapon readily available to Plaintiff.

When officers attempted to remove Plaintiff from his car, he was warned that he would fall on the asphalt. In addition, Plaintiff's foot was stuck on the seat adjustment level, and this caused difficulty when police officers pulled Plaintiff from the car. Plaintiff fell hard. Officers knew the robbery at Silview Liquors was committed by an armed individual, and because they had no idea if Plaintiff was armed, he posed a threat to the officers' safety. Plaintiff indicated that the first incident of which he complains lasted "not even a minute."

Plaintiff was then moved to a grassy area so that Potts could change the handcuffs from the front to the back. According to Plaintiff, he was compliant, but Potts states that Plaintiff was not compliant. When one of Plaintiff's hands was unsecured, Potts used his body weight and leverage to get the unsecured hand behind Plaintiff's back and into handcuffs. Potts' statement indicates that he believed Plaintiff continued to pose a threat. According to Plaintiff, officers kicked him, and he was hit with something metal, but when questioned, he did not recall how long this incident lasted. Plaintiff is unable to identify any of the officers allegedly involved. Other than evidence

20

corroborating Potts' self-confessed presence at the scene, the evidence submitted by Defendants does not speak to any individual's involvement during the second incident. *See Sharrar v. Felsing*, 128 F.3d 810, 821 (3d Cir. 1997), abrogated on other grounds by *Curley v. Klem*, 499 F.3d 199, 209-11 (3d Cir. 2007) (holding that a claim for excessive force requires a party to provide facts that reasonably identify the alleged wrongdoer); *Howell v. Cataldi*, 464 F.2d 272 (3d Cir. 1972) (holding that the district court did not err when it directed a verdict in favor of defendant officers because of plaintiff's failure to make an appropriate identification, even though a witness testified that one of the two defendants beat the plaintiff with a wooden club).

With regard to the first incident (removing Plaintiff from his vehicle), even when viewing the facts in the light most favorable to Plaintiff, it is undisputed that Plaintiff was involved in a serious violent crime and was possibly one of the individuals who had committed a series of armed robberies in New Castle County. His vehicle met the description of that used in the series of robberies. Radio dispatch had indicated that the most recent robbery was committed by an armed individual. Plaintiff led officers on a high speed chase. He did not immediately show his hands when commanded to do so. The possibility of a weapon posed a threat to the Defendants' safety.

Keeping in mind that "police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation," the Court concludes that the force used by Defendants was objectively reasonable to gain control of the situation, *see Graham*, 490 U.S. at 397, and that no reasonable jury could conclude otherwise given Plaintiff's conduct.

21

Similarly, with regard to the second incident (on the grass), although the issue of Plaintiff's compliance or non-compliance is in dispute, in light of the fact that the robberies were committed by armed individuals, he remained a threat to the officers' safety. According to Plaintiff, it was at this time that he was hit in the elbow area with a metal object (presumably the Hooligan tool). Plaintiff does not identify the individual who hit him. The evidence of record identifies only one individual as having a metal object: Galbreath, who used the Hooligan tool to break the Plaintiff's passenger car window. Galbreath's undisputed statement is that he never went near Plaintiff after Plaintiff was removed from his vehicle, and once Plaintiff was on the ground, Galbreath returned to his car. Nothing in the record suggests that Potts (the only individual identified as being present during the second incident) was in possession of a metal tool or that Potts took any action other than to use his weight and leverage to secure Plaintiff in handcuffs behind his back in accordance with standard operating procedures.

Further, the medical records indicate that Plaintiff had face abrasions and contusions, a left knee contusion, and a right heel abrasion, all of which were treated with over the counter medications. However, the medical records do not mention any injury to Plaintiff's elbows or that Plaintiff complained of pain or injuries to his elbows, which is the injury Plaintiff seems to indicate was the result of being hit with something metal during the second incident. The Court notes that the injuries as set forth in the medical records can only be described as de minimis, and do not indicate that Plaintiff was subjected to excessive force. See Sharrar, 128 F.3d at 822 ("We do not agree that the absence of physical injury necessarily signifies that the force has not been

22

excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality").

Accordingly, given Plaintiff's continuing threat to officers' safety; Plaintiff's inability to identify a metal object-wielding officer present at the alleged beating, coupled with the only metal object-wielding officer's undisputed absence from the scene; Plaintiff's inability to identify the officers who allegedly kicked him, to name Potts as one of the kickers, or to pinpoint a number of attackers; and the medical records' failure to indicate an injury to Plaintiff's elbow, I am constrained to find no evidentiary basis on which to hold any of the Defendants liable and no genuine issue of material fact as to the reasonableness of the force used by Defendants to gain control of the situation.

For the above reasons, the Court finds that any force that may have been applied does not rise to the level of a constitutional violation. Therefore, the Court will grant Defendants' motion for summary judgment on the excessive force claim.

**Failure to Protect**

Plaintiff also raises failure to protect claims. "Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). "However, an officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* at 651. For liability to attach under § 1983 or *Bivens* for the failure to intervene in another's use of excessive force, a plaintiff must show that: (1) defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a realistic and reasonable opportunity to intervene. *Id.* at 651.

23

If there is no excessive force, then there is no corresponding duty to intervene. *See Nifas v. Coleman*, 528 F. App'x 132, 135-36 (3d Cir. 2013) ( "Because we find that no constitutional violation occurred with respect to excessive force, Nifas also cannot succeed on his failure-to-intervene claims."). As discussed above, Defendants' actions during Plaintiff's arrest were reasonable and did not violate Plaintiff's constitutional rights with regard to Plaintiff's excessive force claims.

Accordingly, the failure to protect claims fail as a matter of law. Therefore, the Court will grant Defendants' motions for summary judgment as to the failure to protect claims.

**Supplemental Claims**

Having determined that summary judgment is appropriate as to the federal claims, the Court declines to exercise jurisdiction over the supplemental State law claims. *See* 28 U.S.C. § 1367; *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003).

## CONCLUSION

For the above reasons, the Court will: (1) grant Defendant Bouldin's Motion for Summary Judgment (D.I. 261); (2) grant the Motion for Summary Judgment filed by Defendants Lano, Daniels, Duffy, Dudzinski, Galbreath, Glenn, Godek, Grassi, Hawk, Kelly, Kline, Kracyla, Parton, Potts, Rhoades, and Tsai (D.I. 261); (3) grant Defendant Morrissey's Motion for Summary Judgment (D.I. 269); and (4) decline to exercise supplemental jurisdiction over the State claims.

An appropriate order will be entered.